IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DEBBIE RIVERA,

      Plaintiff,

vs.                                No. CIV 05-1049 RB/ACT

SMITH'S FOOD AND DRUG CENTERS,
BRIAN VAN KLAVEREN, JENNY LEE,

      Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** came before the Court on Defendant Smith's Food and Drug Centers' ("Smith") Motion for Summary Judgment (Doc.62), filed on June 29, 2006.  Plaintiff ("Ms. Rivera") seeks recovery for employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, *et seq.*, and the New Mexico Human Rights Act, NMSA 1978, §28-1-7 *et seq.* ("NMHRA").  Having considered the submissions of counsel, relevant law, and being otherwise fully advised, I find that this motion should be denied.

I.      **Background.**

Ms. Rivera worked for Smith from 1984 until she was terminated on January 4, 2005.  When she was terminated, Ms. Rivera worked as a cashier at Smith's Lomas and San Pedro location in Albuquerque, New Mexico.  Ms. Rivera alleges that the store manager, Brian Van Klaveren, sexually harassed her.  On December 17, 2004, Ms. Rivera reported the harassment to Jenny Lee, Smith's regional human resources manager.  On January 4, 2005, Smith terminated Ms. Rivera, ostensibly for misrepresenting the price of an Odwalla juice drink on two occasions.

Ms. Rivera filed suit in state court asserting state-law claims against Smith, Mr. Van Klaveren,

and Ms. Lee.  Defendants removed the matter to this Court based on diversity jurisdiction.  Ms. Rivera amended her complaint to add additional state-law tort claims against Mr. Van Klaveren and Ms. Lee.  The claims against the individuals were dismissed based on fraudulent joinder and preemption.  Ms. Rivera filed a second amended complaint alleging claims for hostile work environment, employment discrimination, and retaliation against Smith under Title VII and NMHRA.  Ms. Rivera seeks compensatory damages, punitive damages, attorney fees, and costs.

Smith seeks summary judgment on all claims.  As to the hostile work environment claim, Smith argues that the conduct of which Ms. Rivera complains did not constitute a hostile work environment or, alternatively, that it is entitled to the affirmative defense set out in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).  As to the retaliation claim, Smith asserts that Ms. Rivera is unable to show pretext.  Finally, Smith contends that summary judgment should be granted on punitive damages based on the affirmative defense set out in *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999).

## II. Facts.

The following statement of facts is set forth in the light most favorable to Ms. Rivera, with all reasonable inferences from the record drawn in her favor. *See Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir.2006).

Beginning in January 2004, Mr. Van Klaveren commented on Ms. Rivera's pants while she was on duty at the U-Scan self-checkout station. (Def. Ex. F, Rivera Depo. at 92-93.)  Mr. Van Klaveren asked Ms. Rivera if she had to lay down to put her pants on and if her pants were painted on. (*Id.*)  Mr. Van Klaveren also told Ms. Rivera that "nobody could wear pants the way [she did]." (Rivera Depo. at 96.)  Another Smith employee, Lorraine Salas, overheard Mr. Van Klaveren

comment to another male employee: "I wonder how [Ms. Rivera] puts her pants on." (Pl. Ex. 2, Salas Depo. at 65-67.) When Ms. Rivera told Mr. Van Klaveren that she did not want to hear such comments, Mr. Van Klaveren laughed at Ms. Rivera.  (*Id.* at 67.)  During 2004, Mr. Van Klaveren commented about Ms. Rivera's pants on at least thirteen separate occasions.  (Rivera Depo. at 93-96.)

On February 13, 2004, Ms. Rivera was working in the floral section with Ms. Salas and Mr. Van Klaveren.  (Rivera Depo. at 107-108.)  A male worker from the produce department was also in the vicinity.  (*Id.*)  Mr. Van Klaveren told Ms. Rivera that she would "look good in a nightie." (Rivera Depo. at 107-108.)  As Ms. Salas remembered it, Mr. Van Klaveren told Ms. Rivera that "[he] would like to see [Ms. Rivera] in a black nightie."  (Rivera Depo. at 108-111; Pl. Ex. 2, Salas Depo. at 77.)  Ms. Rivera slapped Mr. Van Klaveren, and Ms. Salas told Mr. Van Klaveren that the comment was "gross."  (Salas Depo. at 77.)

On another occasion, while Ms. Rivera was arranging magazines, Mr. Van Klaveren asked Ms. Rivera if she had ever been a dancer at the Palomino Club. (Rivera Depo. at 113-116.)  When Ms. Rivera replied she had not, Mr. Van Klaveren asked Ms. Rivera if she had ever been a stripper and stated that "he wished he had a stripper every night."  (Rivera Depo. at 116; 118-119.)  The comments bothered Ms. Rivera, made her "feel bad," lowered her self esteem, and caused her to lose sleep.  (Rivera Depo. at 97-98; 120.)

Patrick Ley, the front-end manager, promised Ms. Rivera that she would be off Christmas Eve 2004, so long as Ms. Rivera worked the Sunday before Christmas and managed the front end of the store.  (Rivera Depo. at 131.)  On December 17, 2004, Ms. Rivera called the store to check her schedule.  (Rivera Depo. at 128.)  Gloria Santos, the employee who answered the phone, told Ms.

3

Rivera that Ms. Rivera was scheduled to work Christmas Eve.  (Rivera Depo. at 133.)  Ms. Rivera became upset and told Ms. Santos that Ms. Rivera was tired of Mr. Van Klaveren commenting about Ms. Rivera's pants.  (*Id.*)

Ms. Rivera reported the incidents to Ms. Lee on December 17, 2004.  (Rivera Depo. at 143-145.)  Ms. Lee, while at a Christmas luncheon with Mr. Van Klaveren, asked Mr. Van Klaveren about the comments.  (Def. Ex. B, Lee Depo. at 143.)  Mr. Van Klaveren did not deny making the comments about Ms. Rivera's pants, but maintained that he did so to enforce the dress code.  (Pl. Ex. 3, Van Klaveren Depo. at 14-15 and 146; Def. Ex. A, Lee Aff. ¶¶ 7, 9.)  Mr. Van Klaveren never sent Ms. Rivera home to change clothes or told her that she needed to wear different clothes to work.  (Van Klaveren Depo. at 16.)  Ms. Lee directed Mr. Van Klaveren to apologize to Ms. Rivera and verbally counseled Mr. Van Klaveren.  (Lee Aff. ¶ 8.)  Ms. Lee did not impose any additional discipline on Mr. Van Klaveren because Ms. Lee felt the comments were "fairly innocuous" and no one had complained that Mr. Van Klaveren had made inappropriate comments to them.  (Lee Aff. ¶ 10.)

Smith had a policy against sexual harassment that was included in the employee handbook and posted on the employee communication board at all stores.  (Pl. Ex. 1, Barth Depo at 41; Def. Ex. E, Barth Aff. ¶¶ 3, 8.)  In 2003, Smith issued a brochure entitled "Harassment in the Workplace," and distributed it to stores with instructions to include copies with employee paychecks.  (Barth Aff. ¶ 6.)  Lower level employees were expected to read the employee handbook and abide by the policies therein.  (Barth Depo at 41.)  Managers received additional training on the sexual harassment policy.  (Barth Aff. ¶ 5.)

The policy required victims of harassment to "firmly and clearly tell" the perpetrator of the

harassment that the behavior is unwelcome, and report the incident to the location manager, district manager, personnel director, human resources department, or the Kroger Help Line.  (Def. Ex. E 3, and E 4.)  The policy stated that the "company will not tolerate reprisals or retaliation against persons reporting alleged harassment . . . ."  (Def. Ex. E 3.)

"Somewhere around December 16, 2004," Peggy Roberts, the assistant store manager, informed Mr. Van Klaveren that Odwalla drinks were showing up on price override reports.  (Van Klaveren Depo. at 147.)  The scanned price of the Odwalla drink was $3.49; the discounted price was $2.50.  (Pl. Ex. 4, Roberts Depo. at 87.)  The discounts started to show up on the reports on December 8, 2004.  (Roberts Depo. at 98-99.)  On or about December 16, 2004, Mr. Van Klaveren directed Ms. Roberts to investigate the Odwalla overrides.  (Van Klaveren Depo. at 147.)

Ms. Roberts checked the Odwalla display and discovered that the "Fresh Values" discount tag displayed the $2.50 price.  (Van Klaveren Depo. at 148-149.)  Cindy Sanchez, a scanning coordinator, found several Fresh Value tags on the display showing various Odwalla drinks on sale. (Def. Ex. I, Sanchez Aff.)  Ms. Roberts, or one of the scanning coordinators, Ms. Sanchez or Cecilia Mendoza, reprinted the tag and put the correct price up on the shelf.  (Van Klaveren Depo. at 155-156; Roberts Depo. at 82; Sanchez Aff.)  On December 17, 2004, Mr. Van Klaveren, Ms. Roberts and Ms. Sanchez checked the shelf and verified the correct tag was up.  (Van Klaveren Depo. 155-156; Pl. Ex. 6, Lee Depo. 86.)

By December 17, 2004, Mr. Van Klaveren and Ms. Roberts were aware of six or seven separate overrides on the Odwalla drink entered by Lisa Zigler, a checker with at least ten years experience with Smith.  (Roberts Depo. at 112; Van Klaveren Depo. at 148..)  According to Ms. Roberts, Ms. Zigler had not prepared "gold slips" to inform the scanning coordinator of the

discrepancy, as required by Smith policy.  (*Id*.)  However, Ms. Zigler recalls that she filled out at least one, and possibly two or three, gold slips on the Odwalla drink.  (Pl. Ex. 5, Zigler Depo. at 65-66.)

In December 2004, the store changed scanning coordinators and gold slips were not always picked up in a timely manner.  (Zigler Depo. at 69.)  Ms. Sanchez, the new scanning coordinator, was at least a week behind in correcting discrepancies noted on the gold slips.  (Zigler Depo. at 70.) Discrepancies between the scanned price and the price displayed on the shelf sometimes persisted for two or three weeks.  (Zigler Depo. at 71.)

Rather than confront Ms. Zigler about the overrides and missing gold slips, Mr. Van Klaveren and Ms. Roberts decided to watch her.  (Roberts Depo. at 83-84.)  On December 23, 2004, Ms. Roberts saw Ms. Rivera walk by with an Odwalla drink.  (Roberts Depo. at 115; Van Klaveren Depo. at 172.)  Ms. Roberts watched Ms. Rivera go through Ms. Zigler's line and pay for the drink. (Roberts Depo. at 117.)  Ms. Roberts immediately notified Mr. Van Klaveren.  *Id.*  Ms. Roberts did not confront Ms. Rivera or Ms. Zigler, but went and scanned another bottle of Odwalla to confirm that the scanned price was $3.49.  (Roberts Depo. at 119.)  Ms. Roberts gave Ms. Rivera the keys to run the front of the store on December 23, 2006.  (Rivera Depo. at 164-165.)

Mr. Van Klaveren called Ms. Lee and informed her about the transactions and his suspicions regarding Ms. Rivera.  (Van Klaveren Depo. at 173.)  Once he consulted Ms. Lee, Mr. Van Klaveren decided that Ms. Rivera should be terminated.  (*Id*.)  While Mr. Van Klaveren did not have authority to terminate an employee, he "could suggest termination."  (Van Klaveren Depo. at 175.)

On December 27, 2004, the discount tag was no longer up and Rivera paid full price for the Odwalla drink.  (Rivera Depo. at 225.)  On December 27, 2004, Ms. Lee went to the store to investigate.  (Lee Depo. at 74; 89.)  On December 28, 2004, Ms. Lee and Mr. Van Klaveren

confronted Ms. Rivera with evidence on the improper discount and Ms. Rivera maintained that the Fresh Value tag was up every time she received the discount. (Lee Aff. ¶¶ 13-14) Ms. Lee concluded that Ms. Rivera was lying. (*Id*.) Ms. Lee called Ms. Rivera on January 4, 2005, and told her that she was terminated for dishonesty and disloyalty to the company. (Rivera Depo. 247-248.)

In late December 2004, Ms. Lee asked Peter Barth, Group Vice-President of Human Resources, to review the termination as it related to the harassment allegation. (Barth Depo at 31.) Mr. Barth relied on the facts as presented by Ms. Lee. (*Id*.) Although the decision had already been made, Mr. Barth reviewed the decision and agreed that it was appropriate. (Barth Depo at 54.) Ms. Lee told Mr. Van Klaveren that "Salt Lake" had instructed Ms. Lee to terminate Ms. Rivera. (Van Klaveren Depo. at 175.)

Any complaints against store directors in New Mexico were supposed to be reported to Ms. Lee, who was supposed to investigate and prepare a report for Mr. Barth. (Barth Depo at 42-45.) Mr. Barth was unaware of any complaints against Mr. Van Klaveren other than the complaint lodged by Ms. Rivera. (Barth Depo at 56.) However, another employee accused Mr. Van Klaveren of slamming her against a wall in 2004. (Van Klaveren Depo. Vol. II at 24-25.) During 2002-2003, at least one employee complained to Ms. Lee that Mr. Van Klaveren discriminated against her on the basis of national origin. (*Id*. at 37.) In 1999, several employees complained that Mr. Van Klaveren incorrectly classified their overtime as a pay adjustment. (Van Klaveren Depo. at 57.)

During her twenty years as a Smith's employee, Rivera received only one written warning. (Pl. Ex. 8.) The warning, dated April 7, 1993, concerned her performance as video manager and did not involve dishonesty. (*Id*.)

In contrast to the swift termination of Ms. Rivera for allegedly obtaining improper discounts

totaling $1.98, other Smith employees were not terminated for similar conduct. On December 8, 2004, Eric Maple, another Smith employee, purchased an Odwalla drink for $1.50 from Ms. Zigler because the sale price was up on the shelf and he had paid full price for another Odwalla drink the day before. (Zigler Depo. at 86.) Ms. Zigler performed at least one additional override on an Odwalla drink for Mr. Maple. (Zigler Depo. at 87.) Mr. Maple was not disciplined for taking improper discounts on the Odwalla. (Pl. Ex. 13, Zigler Aff. ¶ 11.)

Ms. Zigler knows that other employees have purchased items at the Fresh Values price that did not ring up at the Fresh Values price and then had the cashier do a price override. (Zigler Aff. ¶ 12.) Ms. Zigler had performed overrides and had never been questioned. (*Id.*) Ms. Zigler did not receive any discipline in connection with the Odwalla transactions until she asked Mr. Van Klaveren why Rivera had been fired. (Zigler Aff. ¶ 15.) On January 17, 2005, Ms. Zigler was suspended for one day on account of the Odwalla overrides. (Lee Depo. at 129.) Usually, under such circumstances, which are known as "sweetheart checking," Smith deems both the cashier and purchaser as guilty of theft. (Roberts Depo. at 91-92.)

Other employees who were guilty of more egregious misconduct were not terminated for stealing. In 2003 or 2004, the liquor manager informed Mr. Van Klaveren that vodka was disappearing on a weekly basis. (Van Klaveren Depo. Vol. II at 35.) Empty vodka bottles were periodically found stuffed behind aisles throughout the store and in the liquor department. (Van Klaveren Depo. Vol. II at 37-38.) Mr. Van Klaveren did not review surveillance tapes or post someone to watch the liquor department. (Van Klaveren Depo. Vol. II at 37.) Mr. Van Klaveren did not investigate Glenda Herrera, even after he received information that she smelled of liquor on the job. (Van Klaveren Depo. at 218-220.)

8

It was only after Ms. Herrera tested positive for alcohol that Mr. Van Klaveren terminated her; not for stealing, but for drinking on the job. (Van Klaveren Depo. at 218-220.) Mr. Van Klaveren hired Ms. Herrera back a few months later. (*Id*.) Mr. Van Klaveren fired and rehired Herrera on his own, without the approval of Ms. Lee. (Lee Depo at 48.) On March 15, 2005, after Mr. Van Klaveren had been reassigned to another store, Ms. Herrera was fired for drinking stolen vodka out of a Dasani water bottle while she was on duty. (Lee Depo. at 46-47.)

## III.   Standard.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'" *Munoz v. St. Mary Kirwan Hosp.*, 221 F.3d 1160, 1164 (10th Cir.2000) (quoting Rule 56(c)). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id.*

## IV.   Discussion.

### A.   Summary judgment is inappropriate on the sexual harassment claim.

Title VII and the NMHRA prohibit employment discrimination on the basis of sex. *See* 42 U.S.C. §2000e-2(a)(1); NMSA 1978, § 28-1-7(A). If a plaintiff proves that "discrimination based on sex has created a hostile or abusive work environment," she has established a violation of Title VII[1] and the NMHRA. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (Title VII)

---

[1] The analytical framework used for Title VII claims has been applied to claims brought under the NMHRA, and terms in both statutes have been used interchangeably. *See Ocana v. American Furniture Co.*, 135 N. M. 539, 549, 91 P. 3d 58, 68 (2004). Thus, the discussion herein is applicable to both the Title VII and

and *Ocana*, 135 N.M. at 549, 91 P.3d at 68 (NMHRA).

Not all objectionable conduct in the employment context is actionable as sexual harassment. "The conduct must be sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Bolden v. PRC Inc.*, 43 F.3d 545, 550-51 (10th Cir.1994). Conduct is sufficiently severe or pervasive if (1) the conduct "create[d] an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" and (2) the plaintiff "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Smith concedes that Ms. Rivera subjectively perceived Mr. Van Klaveren's conduct to be abusive; it argues that the work environment was not objectively hostile because the harassment was neither severe nor pervasive enough so that a reasonable person would find the environment to be hostile or abusive.

Severity and pervasiveness are evaluated according to the totality of the circumstances, considering such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (quoting *Harris*, 510 U.S. at 23 and *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir.1999). "The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." *O'Shea*, 185 F.3d at 1098.

On at least fifteen separate occasions during 2004, Mr. Van Klaveren made sexually suggestive comments to Ms. Rivera. Mr. Van Klaveren commented about how Ms. Rivera looked in her pants, how she would look in a negligee, and inquired whether she had been a stripper. Ms.

---

NMHRA claims.

Rivera was subjected to these comments while she was working, within earshot of her co-workers and store patrons.  The harassing statements were frequent and humiliating.  When Ms. Rivera protested, Mr. Van Klaveren laughed at her and continued the barrage.  The humiliating nature and context of the comments could interfere with a reasonable person's work performance.

From the evidence, considered in the aggregate and construed in the light most favorable to Ms. Rivera, a reasonable jury could conclude that the sexual harassment was sufficiently severe and pervasive to create an abusive and hostile work environment.  Ms. Rivera has submitted sufficient evidence to preclude summary judgment on her hostile work environment claim.

**B.      Summary judgment is inappropriate on *Faragher/Ellerth* defense.**

An employer may escape vicarious liability for the harassing acts of a supervisory employee if it can establish that (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.  The defense can only be raised, however, if the harassing supervisor took no tangible employment action against plaintiff.  *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1141 (10th Cir.2006); *Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1024 (10th Cir.2001) (citing *Faragher*, 524 U.S. at 807).

Ms. Rivera suffered an adverse employment action; she was terminated.  In order to circumvent this inconvenient fact, Smith argues that Mr. Van Klaveren played no role in her termination.  However, Mr. Van Klaveren initiated and oversaw the investigation of the Odwalla transactions and participated in the December 28, 2004 questioning of Ms. Rivera.  Indeed, Mr. Van Klaveren admitted that he had the authority to suggest termination.  The Tenth Circuit has recognized

that a biased subordinate's discriminatory reports, recommendation, or other actions may cause an adverse employment action. *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 487 (10th Cir.2006). Material facts remain in dispute regarding whether Mr. Van Klaveren used his authority to effect the termination.

Even assuming arguendo that Mr. Van Klaveren took no tangible employment action against Ms. Rivera, Smith has not established, as a matter of law, the applicability of the affirmative defense. An employer is entitled to summary judgment under the *Faragher/Ellerth* affirmative defense "only if the evidence points but one way and is susceptible to no reasonable inferences supporting" the employee. *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir.2000).

As set forth above, the *Ellerth/Faragher* defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. The only training that Ms. Rivera received concerning sexual harassment consisted of her receipt of copies of the employee handbook and the anti-discrimination policy posted in the store. Ms. Salas testified that Ms. Rivera protested to Mr. Van Klaveren and slapped him when he made the comments. When Ms. Rivera reported the comments to Ms. Lee, Ms. Rivera was promptly fired. A reasonable jury could conclude that the *Faragher/Ellerth* affirmative defense is inapplicable. While Smith may raise the defense at trial, it is not entitled to summary judgment based on the *Faragher/Ellerth* affirmative defense.

**C.     Summary judgment inappropriate on pretext.**

Smith argues it is entitled to summary judgment on the retaliation claim because Ms. Rivera

cannot show that the stated reason for her discharge was pretextual.  To state a prima facie case of retaliation, a plaintiff must demonstrate: "(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir.2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006)).  Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Id.*  The burden then shifts back to the plaintiff to show that the employer's proffered reason is pretext.  *Id.* at 1203.

The parties agree that Ms. Rivera has made a prima facie showing of retaliation, and Smith has articulated a legitimate, nondiscriminatory reason for the termination.  Thus, the burden shifted back to Ms. Rivera to show pretext, *i.e.*, to submit evidence from which a reasonable jury could conclude that Smith fired Ms. Rivera because she reported the sexual harassment rather than because she took an improper discount totaling $1.98.

Ms. Rivera must produce evidence of " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' " *Argo*, 452 F.3d at 1203 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997)).  A plaintiff may establish pretext with evidence that the defendant's stated reasons for the adverse employment action were false.  *See Kendrick v. Penske Trans. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000).

The stated reason for the termination was the alleged misrepresentation of the price of the

Odwalla drinks.  Smith relies on the premise that it fired all employees who were caught stealing merchandise.  However, Ms. Rivera submitted evidence that contradicts this premise.  Ms. Salas was reinstated after she was falsely accused of stealing.  Mr. Maples was not disciplined for receiving the same discount as Rivera.  Ms. Zigler was not terminated in connection with the Odwalla override.  Ms. Herrera was not investigated or fired for stealing vodka, even after empty vodka bottles were found hidden in the store, she smelled of liquor, and she failed an alcohol test.  Material facts remain in dispute as to whether Smith consistently fired employees who were caught stealing.

Smith also assumed that the discount tag was not displayed at the time Ms. Rivera purchased the Odwalla drinks.  However, Ms. Rivera has submitted evidence that undermines this assumption.  The overrides had started by December 8, 2004.  Ms. Roberts and Ms. Sanchez verified that discount tags were still on the Odwalla display on December 16, 2004.  Ms. Rivera observed that the tag was up each time she obtained the discount.  According to Ms. Zigler, the scanning coordinator was at least a week behind in correcting discrepancies in December 2004.  Material facts remain in dispute as to whether the discount tag was displayed at the time Ms. Rivera purchased the Odwalla drinks.

Additional inconsistencies surround the termination.  Ms. Lee told Mr. Van Klaveren that "Salt Lake" instructed her to fire Ms. Rivera.  Yet, Mr. Barth testified that the decision had already been made by Ms. Lee when he reviewed it.  Ms. Lee led Mr. Barth to believe that Van Klaveren had a clean record.  In fact, other employees had complained about Mr. Van Klaveren.  These multiple inconsistencies, coupled with the implausibility of firing an otherwise loyal, twenty-year employee for an alleged theft of $1.98 when the possibility of a mistake was evident, support a finding of pretext.  *See Kendrick*, 220 F.3d at 1230.  Ms. Rivera has submitted sufficient evidence to preclude summary judgment on the retaliation claim.

**D.      Summary judgment inappropriate on punitive damages.**

A Title VII plaintiff is entitled to punitive damages if her employer engaged in discriminatory practices "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1).  An employer is vicariously liable for punitive damages "where an employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of employment.' " *Kolstad*, 527 U.S. at 543.  However, " 'in the punitive damages context, an employer may not be vicariously liable for the [violative] decisions of managerial agents where th[o]se decisions are contrary to the employer's good faith efforts to comply with Title VII.' " *McInnis*,  458 F.3d at 1136-37 (quoting *Kolstad*, 527 U.S. at 545).

In order to satisfy *Kolstad*, an employer must (1) adopt antidiscrimination policies; (2) make a good faith effort to educate its employees about these policies and the statutory prohibitions; and (3) make good faith efforts to enforce an antidiscrimination policy.  *McInnis*, 458 F.3d at 1136 (quotations omitted).  However, " 'even if an employer[ ] adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware.' " *Id.* (quoting *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir.2000)).

In *McInnis*, "the evidence was sufficient to support the jury's punitive damages award under a vicarious liability theory because managerial employees . . .  maliciously and recklessly retaliated against [the plaintiff] for reporting sexual harassment." *McInnis*, 458 F.3d at 1137.  Ms. Rivera has submitted evidence from which a reasonable jury could conclude that Mr. Van Klaveren and Ms. Lee maliciously and recklessly retaliated against Ms. Rivera for reporting the sexual harassment that Mr.

Van Klaveren inflicted upon her.  Considering the facts of record, and viewing them in the light most favorable to Ms. Rivera, a reasonable jury could find that Smith failed to enforce, or make good-faith efforts to enforce, its anti-discrimination policies.  Thus, Smith is not entitled to summary judgment on the punitive damages claim based on the *Kolstad* good-faith-compliance standard.  Smith may raise this affirmative defense at trial.

## V.      Conclusion.

Smith is not entitled to summary judgment on any of Ms. Rivera's claims.

**WHEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc.62), filed on June 29, 2006, is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**